## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

**THE STATE OF TEXAS,  MAYO PHARMACY, INC.,**
     *Plaintiffs,*

**v.**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN SERVICES; AND UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE FOR CIVIL RIGHTS,**
     *Defendants.*

**MO:23-CV-00022-DC**

## MEMORANDUM OPINION

A recent trend among federal agencies appears to be borrowing a technique common among money launderers to avoid judicial review. The technique known as "smurfing" in the financial arena occurs when the launderer divides a large transaction—which might otherwise trigger a bank's reporting requirements—into various smaller transactions to avoid detection. For example, an organization wants to transfer $50,000 from one account into another yet would also prefer to avoid the automatic reporting requirement for a transaction of $10,000 or more. To achieve this goal, the organization divides the $50,000 into sums of $9,999 or less and sends them each to different friendly intermediaries: smurfs. The organization then instructs the intermediaries to transfer these smaller deposits into the organization's other account. Through smurfing, the organization hopes that, unlike one large transaction, multiple smaller deposits will individually escape detection. Put simply,

each smaller transaction appears benign; only when the transactions are viewed together does the true motive appear. This case is not about banking. But it is about smurfing, specifically, an agency smurfing its actions to avoid judicial scrutiny.

Agency smurfing, similar to financial smurfing, occurs when the executive branch smurfs one policy goal into multiple, supposedly "unreviewable" and "unchallengeable" pieces. Consider an executive branch, who, immediately following a Supreme Court decision, seeks to achieve a policy goal contrary to the Court's holding. The executive branch knows, however, that courts will likely view that policy goal as incompatible with the Supreme Court's reasoning. In its efforts to avoid scrutiny, and eventual discovery of their true purpose, the executive branch breaks up the policy goal into separate, seemingly unrelated and innocent pieces—an executive order here, a press release and guidance there.

Then, if sued, the executive branch argues that—*individually*—none of the divided pieces create an imminent threat of harm, thus preventing potential plaintiffs from successfully challenging the policy goal. And because the executive branch contends that each action *individually* represents an amorphous, non-final action, they are therefore unreviewable by the courts. For those being regulated, however, these individual "unreviewable" and "unchallengeable" pieces link to create a looming enforcement threat.

## Background

On June 24, 2022, the Supreme Court handed down its decision in *Dobbs v. Jackson Women's Health Organization*, holding that "the Constitution does not confer a right to abortion" and "does not prohibit the citizens of each State from regulating or prohibiting

abortion."[1] The *Dobbs* decision overturned the Supreme Court's prior decisions on abortion like *Roe v. Wade* and *Planned Parenthood v. Casey*. Thus, states can regulate abortion how they see fit.

Two weeks after *Dobbs*, the Biden Administration issued an Executive Order, titled "Protecting Access to Reproductive Healthcare Services." This Executive Order requires the Department of Health and Human Services ("HHS") and its secretary, Xavier Becerra, to protect and expand access to abortion care and reproductive healthcare services.

Three days after President Biden's Executive Order, HHS released a guidance document ("Pharmacy Guidance"), which, according to an accompanying press release, follows President Biden's Executive Order.[2] The Pharmacy Guidance is directed at United States retail pharmacies, reminding them of their obligations under federal civil rights law. In relevant part, the Pharmacy Guidance states "the Department of Health and Human Services' (HHS or Department) Office for Civil Rights (OCR) is responsible for protecting the rights of women and pregnant people in their ability to access care that is free from discrimination.[3] This includes their ability to access reproductive health care, including prescription medication from their pharmacy, free from discrimination."[4] What's more, the Guidance highlights that under § 1557 of the Affordable Care Act and Section 504 of the Rehabilitation Act of 1973, "[p]harmacies …may not discriminate against pharmacy

---

[1] 142 S. Ct. 2228, 2279, 2284 (2022).

[2] Guidance to Nation's Retail Pharmacies: Obligations Under Fed. Civil Rights Laws to Ensure Access to Comprehensive Reproductive Health Care Services (July 13, 2022) https://www.hhs.gov/civil-rights/for-individuals/special-topics/reproductive-healthcare/pharmacies-guidance/index.html [hereinafter Pharmacy Guidance or the Guidance].

[3] For its own edification, the Court looks forward to HHS explaining where the term "pregnant people" lands on the "spectrum" between men and women.

[4] *Id.*

customers … including with regard to supplying medications; making determinations regarding the suitability of a prescribed medication for a patient; or advising patients about medications and how to take them."[5]

Texas believes the Pharmacy Guidance seeks to preempt two parts of Texas law. First, under Texas's Human Life Protection Act, "[a] person may not knowingly perform, induce, or attempt an abortion."[6] Second, under a series of statutes predating *Roe v. Wade*, any person who causes an abortion, or furnishes the means for procuring an abortion knowing the intended purpose, is guilty of an offense and subject to imprisonment.[7] These laws do, however, include exceptions for the health and safety of the mother.[8]

The state of Texas and Mayo Pharmacy, Inc. (together, "Plaintiffs") now sue HHS, HHS's Office for Civil Rights, and HHS Secretary Becerra in his official capacity (together, "Defendants"), alleging the Pharmacy Guidance and accompanying press release require pharmacies to dispense abortion-inducing drugs as a condition of receiving Medicare and Medicaid funds. Specifically, Plaintiffs claim (1) the Pharmacy Guidance exceeds HHS's statutory authority and conflicts with federal law, (2) the Pharmacy Guidance is an arbitrary and capricious agency action, and (3) HHS failed to conduct notice-and-comment rulemaking. Texas also alleges the Pharmacy Guidance and accompanying press release are an unconstitutional exercise of the Spending Clause power, while Mayo also contends the Pharmacy Guidance would cause it to violate its sincerely held religious beliefs in violation of the Religious Freedom Restoration Act ("RFRA").

---

[5] *Id.*
[6] Act of May 25, 2021, 87th Leg., R.S., ch. 800, 2021 Tex. Sess. Law Serv. 1887 (H.B. 1280) (codified at Tex. Health & Safety Code Ch. 170A).
[7] Tex. Rev. Civ. Stat. arts. 4512.1
[8] Tex. Health & Safety Code § 170A.002(b)(2)).

Defendants move to dismiss Plaintiffs' claims for three reasons. First, Defendants argue Plaintiffs lack standing and the Pharmacy Guidance is not final agency action, thus the Court should dismiss Plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Second, Defendants argue Mayo's RFRA claim should be dismissed for failure to state a claim under Rule 12(b)(6). Lastly, Defendants ask the Court to dismiss Mayo's RFRA claim for improper venue under Rule 12(b)(3).

## LEGAL STANDARD

### I. Rule 12(b)(1).

Because federal courts are courts of limited jurisdiction, they possess only the power authorized by the Constitution and federal statutes.[9] Motions filed under Federal Rule of Civil Procedure 12(b)(1) allow a party to challenge the trial court's subject matter jurisdiction to hear a case.[10]

Lack of subject matter jurisdiction may be found in any of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.[11] "[A]ll uncontroverted allegations in the complaint must be accepted as true."[12] "Thus, unlike a motion to dismiss under [Federal] Rule 12(b)(6), when examining a motion to dismiss for lack of subject matter jurisdiction under [Federal] Rule 12(b)(1), the

---

[9] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).
[10] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).
[11] *Id.* (citing *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).
[12] *Taylor v. Dam*, 244 F. Supp. 2d 747, 752 (S.D. Tex. 2003) (citations omitted).

district court is entitled to consider disputed facts as well as undisputed facts in the record."[13]

The burden of proof for a Federal Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.[14] Indeed, "there is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court."[15]

## II.    Rule 12(b)(3).

Under Rule 12(b)(3) of the Federal Rules of Civil Procedure, a party may move to dismiss or transfer a claim for improper venue.  "The Fifth Circuit has not ruled on which party bears the burden on a Rule 12(b)(3) motion," but "most district courts within this circuit have imposed the burden of proving that venue is proper on the plaintiff once a defendant has objected to the plaintiff's chosen forum."[16] If there is no evidentiary hearing, a plaintiff may carry its burden by presenting facts that, taken as true, would establish venue.[17] The court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff.[18] Further, in deciding whether venue is proper, "the court is permitted to look at evidence beyond simply those facts alleged in the complaint and its proper attachments."[19]

## III.    Rule 12(b)(6).

---

[13] *Id.* (citations omitted).

[14] *Ramming*, 281 F.3d at 161 (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)); *Taylor*, 244 F. Supp. 2d at 752.

[15] *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996).

[16] *Galderma Labs., LP v. Teva Pharm. USA, Inc.*, 290 F. Supp. 3d 599, 605 (N.D. Tex. 2017); *see also Broadway Nat'l Bank v. Plano Encryption Techs., LLC*, 173 F. Supp. 3d 469, 473 (W.D. Tex. 2016).

[17] *Langton v. Cheyond Commc'n, L.L.C.*, 282 F. Supp. 2d 504, 508 (E.D. Tex. 2003).

[18] *Id.*; *see also Braspetro Oil Servs., Co. v. Modec (USA), Inc.*, 240 Fed. Appx. 612, 615 (5th Cir. 2007) (per curiam) (unpublished).

[19] *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009).

Under Rule 12(b)(6) of Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[20] "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"[21] In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[22]

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[23] "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[24] A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[25] A court may also consider documents that a defendant attaches to a motion to

---

[20] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

[21] *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[22] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

[23] *Id.*

[24] *Id.*

[25] *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted).

dismiss "if they are referred to in the plaintiff's complaint and are central to her claim."[26] But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint.[27] "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'"[28]

## DISCUSSION

Federal courts are a limited forum for reviewing agency action.[29] For example, under Article III of the Constitution, only plaintiffs with "standing" may challenge an agency's action in federal court.[30] Put simply, "standing" means that an agency's action has created a current controversy that caused (or will soon cause) a plaintiff to suffer "an invasion of a legally protected interest" that is "concrete and particularized."[31] So if a plaintiff fails to show that an agency's action created a present controversy, which caused or will cause a concrete and particularized injury, they cannot challenge the agency's action in federal court.

Likewise, Congress has given federal courts jurisdiction to review only "final agency actions"—an action that marks the consummation of the agency's decision-making process from which legal consequences flow.[32] Generally, final agency action comes about through a formal process known as notice-and-comment rulemaking.[33] But final agency action is not always born through a formal process; sometimes a less formal process such as agency

---

[26] *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

[27] *Dorsey,* 540 F.3d at 338.

[28] *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

[29] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

[30] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

[31] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016).

[32] *Louisiana v. U.S. Army Corps of Eng'rs,* 834 F.3d 574, 584 (5th Cir. 2016); *U.S. Army Corps of Eng'rs v. Hawkes Co.,* 578 U.S. 590, 597 (2016).

[33] 5 U.S.C. § 533.

guidance is sufficiently "final" to qualify.[34] But if an agency's action does not qualify as "final agency action," that action is unreviewable by a federal court.

These limitations are important, but the system can be gamed. Indeed, any agency that seeks to operate with impunity is motivated to couch its actions as "unchallengeable" and "unreviewable." And that's how HHS frames the Pharmacy Guidance here.

Plaintiffs' standing in this case turns on the answer to a single question: does the Pharmacy Guidance require pharmacies to dispense drugs for abortion purposes? Defendants argue now that the Pharmacy Guidance only "addresses situations in which a pharmacy would fail to fill a prescription for *non-abortion* purposes."[35] What's more, Defendants argue that "Texas cannot point to any language in the guidance that purports to require pharmacies to dispense drugs for abortion purposes."[36] Thus, in Defendants' view, because the Pharmacy Guidance is not about abortion, it "does not conflict with, or purport to preempt, Texas laws that restrict abortion."[37] But that argument perfectly evidences agency smurfing—an executive branch breaking up a policy goal into silos, hoping to sever the threads that link the compartmentalized pieces to the executive's goal.

Try as they might, Defendants cannot obscure the temporal and thematic relationship between the Pharmacy Guidance and the executive branch's policy goal. First, as to the temporal proximity, the Supreme Court decided *Dobbs v. Jackson Women's Health Organization* on June 24, 2022, holding that the decision to regulate abortion should be left to the states

---

[34] *See Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011).
[35] Doc. 31 at 8.
[36] *Id.*
[37] *Id.*

because "the Constitution does not confer a right to abortion."[38] Merely two weeks later, President Biden issued an Executive Order, lamenting that the Supreme Court "eliminated a woman's Constitutional right to choose"—"a woman's right to make her own *reproductive health care* decisions, free from government interference."[39] And three days after that, HHS released the Pharmacy Guidance, which the accompanying press release boasted comes "following President Biden's Executive Order on ensuring access to reproductive health care."[40] So based on temporal proximity, the flurry of executive branch activity was clearly in reaction to *Dobbs*'s holding on abortion rights.

Next, the theme. President Biden's Executive Order instructed HHS to "identify potential actions (A) to protect and expand access to abortion care, *including medication abortion*; and (B) to otherwise protect and expand access to the full range of *reproductive healthcare services*[.]"[41] The Executive Order then defines "reproductive healthcare services" to include abortion. In fact, the Executive Order makes no effort to mask its purpose: "[t]he term 'reproductive healthcare services' means medical, surgical, counseling, or referral services relating to the human reproductive system, including services relating to pregnancy *or the termination of a pregnancy*."[42]

---

[38] *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2279 (2022).

[39] FACT SHEET: President Biden to Sign Executive Order Protecting Access to Reproductive Health Care Services | The White House, July 8, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/08/fact-sheet-president-biden-to-sign-executive-order-protecting-access-to-reproductive-health-care-services/.

[40] Press Release, U.S. Department of Health & Human Services, HHS Issues Guidance to the Nation's Retail Pharmacies Clarifying Their Obligations to Ensure Access to Comprehensive Reproductive Health Care Services (July 13, 2022).

[41] Protecting Access to Reproductive Healthcare Services,  Exec. Order No. 14,076, 87 Fed. Reg. 42053, 42053 (July 8, 2022) (emphasis added).

[42] *Id.* (emphasis added)

What's more, the Pharmacy Guidance prohibits pharmacies from "making determinations regarding the suitability of a prescribed medication for a patient." In other words, pharmacies have no discretion to withhold dispensing medication even if they believe dispensing such medication in a given circumstance would violate the law. The Pharmacy Guidance then invokes the proverbial hammer of HHS's Office for Civil Rights, who "is responsible for protecting the rights of women and pregnant people in their ability . . . to access reproductive health care, including prescription medication from their pharmacy." The Pharmacy Guidance also solicits complaints from anyone who believes there's been a violation. In that context, and with that content, HHS issues a threat—a pharmacy's failure to comply with the Pharmacy Guidance will result in "vigorous enforcement of [] civil rights laws."

The "vigorous enforcement" line is not an empty threat. Indeed, in a statement released the same day as the *Dobbs* decision, HHS Secretary Becerra could not have made HHS's goal clearer:

> Today's decision is unconscionable. Abortion is a basic and essential part of health care—and patients must have the right to make decisions about their health care and autonomy over their own bodies. … At the Department of Health and Human Services, we stand unwavering in our commitment to ensure every American has access to health care and the ability to make decisions about health care—including the right to safe and legal abortion, such as medication abortion that has been approved by the FDA for over 20 years. I have directed every part of my Department to do any and everything we can here. As I have said before, we will double down and use every lever we have to protect access to abortion care. To everyone in this fight: we are with you.[43]

---

[43] Press Release, U.S. Department of Health & Human Services, HHS Secretary Becerra's Statement on Supreme Court Ruling in Dobbs v. Jackson Women's Health Organization (June 24, 2022).

In sum, Defendants' straight-faced argument is that the Pharmacy Guidance, titled "Obligations under Federal Civil Rights Laws to Ensure Access to Comprehensive Reproductive Health Care Services"—which was HHS's response to the Biden Administration's command for HHS to protect and expand access to "Reproductive Health Care" and "medication abortion," which in turn was the executive branch's response to the Supreme Court's decision on abortion in *Dobbs*—is now somehow *not* about abortion.

This is clearly agency smurfing. The executive branch has a policy goal—ensuring access to "medication abortion" and "reproductive healthcare services" post-*Dobbs* in circumvention of the Supreme Court's ruling. So the executive branch ordered an agency to implement a scheme to protect access to "reproductive health care [termination of a pregnancy], including prescription medication from their pharmacy."[44] And, in an effort to avoid the inevitable judicial review, the agency issued its guidance, threatening enforcement action that the agency can later claim is unrelated to abortion, even though the executive's policy goal is accomplished by its implementation.

The Court notes that it's not the first time it has encountered agency smurfing; this administration's Securities and Exchange Commission ("SEC") used the same tactic just last year. In that case, the SEC did three things on the same day.[45] First, the new Chair of the SEC, Gary Gensler ("Chair Gensler"), issued a statement directing staff to recommend further regulatory action regarding proxy voting advice.[46] Second, right after Chair Gensler's

---

[44] Protecting Access to Reproductive Healthcare Services,  Exec. Order No. 14,076, 87 Fed. Reg. 42053, 42053 (July 8, 2022)

[45] *Nat'l Ass'n of Manufacturers v. United States Sec. & Exch. Comm'n*, No. MO:21-CV-183-DC, 2022 WL 16727731 (W.D. Tex. Sept. 28, 2022).

[46] *See* Chair Gary Gensler, Statement on the Application of the Proxy Rules to Proxy Voting Advice (June 1, 2021), https://www.sec.gov/news/public-statement/gensler-proxy-2021-06-01.

statement, the SEC's Division of Corporate Finance—the entity responsible for overseeing the implementation of proxy rules—issued a statement declaring it would no longer recommend enforcement actions premised on the previous administration's proxy rule while the SEC considered alternatives.[47] And lastly—again that same day—the SEC moved to hold other litigation in abeyance, stating that if the case were held in abeyance "the Division's no-action statement provides [proxy voting advice businesses] relief from the December 1, 2021 compliance date."[48]

The SEC argued its actions were not reviewable as "final agency action" because none of the three actions—in isolation—suspended the compliance date. Put simply, the SEC thought it could evade judicial review by breaking down the policy goal into separate, unreviewable silos. In effect, the SEC in that case, and Defendants here, ask the Court to believe that the executive branch's actions, which exhibit such a close temporal and thematic relationship, are mere coincidences. The Court declined to do so there and likewise declines to do so here.[49]

In short, this Court is "not required to exhibit a naiveté from which ordinary citizens are free"—the Pharmacy Guidance requires pharmacies to dispense drugs for abortion purposes.[50] And with the modus operandi identified, the issues become clear.

---

[47] SEC Division of Corporation Finance, Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rules 14a-1(l), 14a-2(b), 14a-9 (June 1, 2021), https://www.sec.gov/news/public-statement/corp-fin-proxy-rules-2021-06-01.

[48] *See Institutional S'holder Servs., Inc. v. SEC et al.*, No. 1:19-cv-3275 (D.D.C.) (Doc. 53 at 4).

[49] The SEC eventually changed the proxy voting advice rule through notice-and-comment rulemaking, which this Court upheld as not arbitrary and capricious. *Nat'l Ass'n of Manufacturers v. United States Sec. & Exch. Comm'n*, No. MO:22-CV-00163-DC, 2022 WL 17420760 (W.D. Tex. Dec. 4, 2022).

[50] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019) (Roberts, C.J.) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

I.        **The Court has subject matter jurisdiction over Plaintiffs' claims.**

Defendants' first motion for dismissal contends this Court lacks subject-matter jurisdiction over Plaintiffs' claims because (1) Plaintiffs lack standing, (2) the Pharmacy Guidance is not a reviewable final agency action under the Administrative Procedure Act ("APA"), and (3) Plaintiffs' claims are unripe.

A.  **Plaintiffs have standing to challenge the Pharmacy Guidance.**

As mentioned above, Article III of the Constitution requires Plaintiffs have "standing," which means Plaintiffs must show they have suffered an injury in fact.[51] A plaintiff may have standing for an injury that hasn't yet happened if the alleged injury is "imminent, not conjectural or hypothetical."[52] Without standing, however, the Pharmacy Guidance would be "unchallengeable." That said, a plaintiff at the motion to dismiss stage need only "allege facts that give rise to a plausible claim of standing."[53]

In the pre-enforcement context, which is the case here, a plaintiff may establish an injury in fact if two things are true. First, the plaintiff shows "an 'intention to engage in a course of conduct arguably affected with a constitutional interest' that is 'arguably … proscribed by [the policy in question].'"[54] Second, "'the threat of future enforcement of the [challenged policies] is substantial.'"[55]

---

[51] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016).

[52] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[53] *Barilla v. City of Houston, Texas*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir. 2009)).

[54] *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162–64 (2014)).

[55] *Id.*

     *i.  Plaintiffs have shown an intention to engage in conduct proscribed by the Pharmacy Guidance.*

Texas, as a sovereign state, is not a "normal litigant[] for purposes of invoking federal jurisdiction."[56] Indeed, "states have a sovereign interest in 'the power to create and enforce a legal code.'"[57] And because of that interest "states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law[.]"[58] Texas has clearly indicated that it intends to enforce its state laws and prevent Texas pharmacies from dispensing the drugs for abortion purposes. Likewise, Mayo pleads its past practice and current intention to not dispense any drugs for abortion purposes because of its religious beliefs.

Defendants' first (and main) counter, however, is that the Pharmacy Guidance only "addresses situations in which a pharmacy would fail to fill a prescription for *non-abortion* purposes."[59] In other words, because the Pharmacy Guidance does not force pharmacies to dispense drugs for abortion purposes, there's no conflict with Texas law or Mayo's religious beliefs; thus, no injury.

Yet as the Court outlines above, Defendants' first argument belies the clear temporal and thematic relationship between the Pharmacy Guidance and the openly stated policy goal of "ensuring access to medication abortion."[60] Claiming now that the executive branch's actions are not about abortion is disingenuous at best. Defendants' argument rings hollow—

---

[56] *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).
[57] *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), *as revised* (Nov. 25, 2015).
[58] *Id.*
[59] Doc. 31 at 8.
[60] Protecting Access to Reproductive Healthcare Services,  Exec. Order No. 14,076, 87 Fed. Reg. 42053, 42053 (July 8, 2022).

in fact, the Court provided Defendants the opportunity to put their money where their mouth is, but they refused to do so.

Indeed, the Court asked counsel multiple times at a hearing whether, since they claim the Pharmacy Guidance covers only "non-abortion purposes," Defendants would oppose a declaratory judgment in Texas's favor, stating that the Pharmacy Guidance does not require Texas pharmacies to dispense drugs for abortion purposes in violation of Texas law. The Court would then transfer Mayo's claims for lack of jurisdiction because the crux of the case—Texas's sovereign interest in creating and enforcing a legal code—would no longer be an issue. Defendants, however, opposed that idea—repeatedly. Given that chance, the Court thinks the Defendants "doth protest too much."[61]

What's more, Defendants informed the Court at the hearing that the Pharmacy Guidance is mainly geared toward dispensing drugs for non-abortion ailments like rheumatoid arthritis. That argument, however, is at odds with the very guidance at issue here. Even the title of the Pharmacy Guidance makes clear that HHS will invoke civil rights law to "Ensure Access to Comprehensive Reproductive Health Care Services." The Court is, to date, unaware that treatment for rheumatoid arthritis–an autoimmune disease that causes inflammation (painful swelling) in the affected parts of the body like the joints—could be classified as "reproductive health care." So by their argument, Defendants insist that the Court buy the ridiculous argument that a guidance document clearly stating its purpose as ensuring access to reproductive healthcare services actually is about people receiving drugs to treat rheumatoid arthritis.

---

[61] William Shakespeare, The Tragedy of Hamlet, Prince of Denmark, act 3, sc. 2, l. 254.

The Pharmacy Guidance does require pharmacies to dispense drugs for abortion purposes. It seeks to preempt and interfere with Texas's sovereign interest in enforcing its legal code. Likewise, the Pharmacy Guidance plausibly requires Mayo "to lend what its religion teaches to be an impermissible degree of assistance to the commission of what their religion teaches to be a moral wrong."[62] Thus, Plaintiffs have plausibly alleged an intention to engage in activity proscribed by the Pharmacy Guidance.

      *ii.   The risk of enforcement is substantial.*

Defendants next contend there is no risk of enforcement because Plaintiffs' claims are "based on speculation that HHS will enforce the pharmacy guidance against pharmacies."[63] That contention would be more believable but for two things. First, as noted above, the Pharmacy Guidance invites anyone to submit a complaint for any perceived violation of the Guidance's requirements to HHS's Office for Civil Rights. And that's not solicitation without teeth; HHS has already received the requested complaints and begun investigating CVS and Walgreens because of such complaints.[64]

Second, HHS released other "guidance" documents following President Biden's Executive Order around the same time as the Pharmacy Guidance. For example, two days before the Pharmacy Guidance was released, HHS issued clarifying guidance on the Emergency Medical Treatment and Active Labor Act ("EMTALA"), stating that emergency

---

[62] *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1154 (10th Cir. 2013) (Gorsuch, J., concurring), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

[63] Doc. 31 at 8.

[64] Secretary Becerra (@SecBecerra), Twitter (Oct. 14, 2022, 6:55 PM) https://twitter.com/SecBecerra/status/1581071321814818817 (linking to Amanda Perez Pintado, *Walgreens, CVS pharmacists are withholding medications for people post-Roe*, USA TODAY (Oct. 14, 2022), https://www.usatoday.com/story/money/2022/10/13/walgreens-cvs-withholding-medications-post-roe/10476400002/ (last accessed June 30, 2023)) (CVS and Walgreens have since "resolved" these complaints to HHS's satisfaction, a predictable outcome when the federal government focuses its investigative eye on private entities that step out of line. Doc. 39, Ex. 1).

medical care includes abortion. HHS has since sued the state of Idaho, arguing EMTALA preempts the state's abortion laws.[65] So HHS's promised "vigorous enforcement" has already started for other guidance documents stemming from the same Executive Order. Why would the agency's actions concerning the Pharmacy Guidance be any different? When Secretary Becerra says he has "directed every part of [HHS] to do any and everything we can" to "ensure every American has access to health care … including the right to safe and legal abortion, such as medication abortion," the Court has no reason to doubt him.

     *iii.   Plaintiffs have standing under the APA.*

Because Plaintiffs sue under the APA, along with Article III standing requirements, "the interest [Plaintiffs] assert[ ] must be 'arguably within the zone of interests to be protected or regulated by the statute' that [they] say[ ] was violated."[66] Here, because the Pharmacy Guidance purports to require pharmacies to dispense drugs for abortion purposes contrary to Texas law and Mayo's religious beliefs, Plaintiffs' asserted interests arguably fall within the zone of interests regulated by the Guidance. As a result, Plaintiffs may sue under the APA.

## B. The Pharmacy Guidance is reviewable under the APA as final agency action.

Next, the Court moves to Defendants' claim that the Pharmacy Guidance is "unreviewable" because it is not "final agency action." For there to be final agency action, two requirements must be met. First, "the action must mark the consummation of the

---

[65] *United States v. Idaho*, No. 1:22-CV-329 (D. Idaho, Aug. 2, 2022) (Doc. 1).

[66] *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

agency's decision-making process—it must not be of a merely tentative or interlocutory nature."[67] Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."[68] The Fifth Circuit considers these requirements to be "a jurisdictional prerequisite of judicial review."[69] This inquiry, however, is generally a "pragmatic" one.[70]

        i.   *The Pharmacy Mandate marks the consummation of HHS's decision-making process.*

The Pharmacy Guidance consummated HHS's decision-making process. The Pharmacy Guidance stemmed from President Biden's Executive Order, a response to the Supreme Court's *Dobbs* decision. And since its announcement, the Pharmacy Guidance has remained published and unchanged, hanging over Plaintiffs' heads like the sword of Damocles. Pragmatically, it's more than plausible, and Defendants have not shown otherwise, that the Pharmacy Guidance is "not subject to further Agency review."[71] This is it.

Likewise, "[t]he mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."[72] "An action is either final or not, and the mere fact that the agency

---

[67] *U.S. Army Corps of Eng'rs v. Hawkes Co.,* 578 U.S. 590, 597 (2016).
[68] *Id.*
[69] *Louisiana v. U.S. Army Corps of Eng'rs,* 834 F.3d 574, 584 (5th Cir. 2016).
[70] *Id.* at 599.
[71] *Sackett v. EPA,* 566 U.S. 120, 127 (2012).
[72] *Id.*; *Hawkes,* 578 U.S. at 598 ("The Corps may revise an [action] within the five-year period based on new information. That possibility, however, is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal.").

could—or actually does—reverse course in the future does not change that fact."[73] HHS's actions are final.

ii. *Legal consequences flow from the Pharmacy Guidance.*

The Pharmacy Guidance is also intended to carry the chilling threat of legal consequences; how could the Court not find legal obligations emanating from the Pharmacy Guidance? At the risk of sounding redundant, here again is the timeline. First, *Dobbs* returned abortion regulation to the states. Two weeks later, President Biden issued an Executive Order demanding HHS implement policies "to protect and expand access" to "medication abortion" and "the full range of reproductive healthcare services."[74] HHS heeded that call by issuing various guidance documents on ensuring access to "reproductive health care" in a post-*Dobbs* world, threatening "vigorous enforcement of our civil rights laws" against those who dare not comply. HHS then started investigating and bringing to heel regulated persons and entities for not dispensing certain drugs used for abortion. Now, Defendants argue the Court should ignore all that because, as they repeatedly say, "the Pharmacy Guidance is not about abortion." Defendants illogically expect the Court, like the Sergeant Schultz character of Hogan's Heroes television fame, to see nothing, hear nothing and know nothing, even with it happening right before its very eyes.[75] This is a transparently shameless, and not very clever, effort by the executive branch at death by a thousand cuts to the *Dobbs* ruling. Death by a thousand cuts is death nonetheless.

---

[73] *Data Marketing P'ship, LP v. DOL,* 45 F.4th 846, 854 (5th Cir. 2022).
[74] Protecting Access to Reproductive Healthcare Services,  Exec. Order No. 14,076, 87 Fed. Reg. 42053, 42053 (July 8, 2022) (emphasis added).
[75] *Hogan's Heroes: Hold that Tiger* (CBS television broadcast Sept. 24, 1965).

Defendants' argument that the Pharmacy Guidance states it has no legal effect is unpersuasive. An agency guidance document that reflects a "settled agency position" that the entire agency intends to follow in its enforcement of its regulations, and that gives "marching orders" to a regulated entity, is "final" agency action against the regulated entity—even if the document contains boilerplate language denying its legal effect.[76]

 iii. *There is no adequate, alternative remedy for Plaintiffs.*

The APA also limits judicial review to "those agency actions which otherwise lack an 'adequate remedy in a court.'"[77] Defendants thus argue judicial review is unavailable because an adequate, alternative remedy already exists, namely, through HHS's internal review process if an enforcement action is brought. That argument fails for two reasons.

First, Defendants omit the "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'"[78] And the only way that such presumption can be rebutted is by showing that "the relevant statute 'preclude[s]' review, or that the 'agency action is committed to agency discretion by law.'"[79] Defendants point to no such statute. Nor do they show such action is committed to HHS's discretion by law.

Second, according to Defendants' argument, HHS is who would need to initiate the review process by first "giv[ing] notice of a potential violation" and then investigating.[80] But as the Supreme Court noted in *Sackett v. EPA*, "judicial review must come via the

---

[76] *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000).

[77] *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (per curiam) (quoting *Bowen v. Mass.*, 487 U.S. 879, 903 (1988)); 5 U.S.C. 15 § 704 (review available for "final agency action for which there is no other adequate remedy in a court").

[78] *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020).

[79] *Id.* (citing § 701(a)(1)–(2)).

[80] Doc. 31 at 15.

petitioner's direct appeal."[81] In *Sackett*, "[t]he Court concluded that the first proposed alternative … was inadequate because petitioners 'cannot initiate that process' and risked onerous liability."[82] Indeed, a plaintiff need not sit and "wait for the Agency to drop the hammer."[83] In short, no alternative remedy available to Plaintiffs is adequate.

Before the *Dobbs* decision was even a day old, Secretary Becerra figuratively pounded the table, declaring that HHS would "double down and use every lever we have to protect access to abortion care."[84] Consider the levers pulled—the Pharmacy Guidance is reviewable as "final agency action."

### C.  Plaintiffs' claims are ripe.

Defendants also contend Plaintiffs' claims are "unripe," meaning there is no case or controversy making this case "ripe for adjudication."[85] "Ripeness is a twofold inquiry that requires courts to 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"[86] In the context of pre-enforcement agency action, the established factors are "whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final."[87] Failure on even one of the three prongs can render a case unfit for judicial review.[88]

---

[81] *Hinojosa v. Horn*, 896 F.3d 305, 311 (5th Cir. 2018) (citing *Sackett v. EPA*, 566 U.S. 120 (2012)).

[82] *Id.*

[83] *Sackett*, 566 U.S. at 127.

[84] Press Release, U.S. Department of Health & Human Services, HHS Secretary Becerra's Statement on Supreme Court Ruling in Dobbs v. Jackson Women's Health Organization (June 24, 2022).

[85] *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 311 (5th Cir. 2021).

[86] *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

[87] *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986).

[88] *See Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 812 (2003).

There's no dispute in this case that the issues are "purely legal" or that more facts are needed to provide a "more concrete setting." And as stated above, HHS's actions are sufficiently final. Thus, Plaintiffs' claims are ripe for adjudication.

## II.     Defendants' motion to dismiss Mayo's RFRA claim under Rule 12(b)(3).

Defendants next move to dismiss Mayo's RFRA claim under Rule 12(b)(3), contending this Court is not the proper venue for the claim. Venue in this case is governed by 28 U.S.C. § 1391(e), which allows venue "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, … or (C) the plaintiff resides if no real property is involved in the action."

None of the three apply in this case. Mayo instead claims "[V]enue is proper as to all plaintiffs if suit is brought in a district where any one or more of the plaintiffs resides."[89] In other words, Mayo can piggyback off Texas having proper venue for its claims. But that assertion is only half correct; under the Fifth Circuit's reasoning, venue is established claim by claim, not by the entire suit.

In *Tucker v. U.S. Department of Army*, the Fifth Circuit's per curiam opinion noted "the general rule that venue must be proper as to each distinct cause of action."[90] The *Tucker* court cited the 1972 district court opinion in *Jones v. Bales*, which held "[w]here several overt acts appear in the complaint, venue must be proper as to each cause of action."[91] And on

---

[89] Doc. 37 at 18 (quoting *Crane v. Napolitano*, 920 F. Supp. 2d 724, 746 (N.D. Tex. 2013) *aff'd sub nom. Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015)).
[90] 42 F.3d 641, *2 (5th Cir. 1994) (per curiam) (unpublished).
[91] 58 F.R.D. 453 , (N.D. Ga. 1972), *aff'd*, 480 F.2d 805 (5th Cir. 1973).

appeal, the Fifth Circuit affirmed that holding, stating it was doing so "on the basis of the reasons stated and authorities cited in the [district court's] final order."[92]

Even the cases Mayo cites don't support their argument. For instance, Mayo cites *Crane v. Napolitano*, which held "venue is proper in this district as to all plaintiffs" "[b]ecause Plaintiff Engle resides in the Northern District of Texas."[93] True, but the plaintiffs in *Crane* all asserted the same claims. So each "distinct cause of action" had at least one plaintiff (Engle) with proper venue in the Northern District of Texas. That's not the case here.

Because venue is not proper for Mayo's RFRA claim, the Court has options. First, under 28 U.S.C. § 1404(a), the Court could dismiss Mayo's RFRA claim or "transfer such case to any district or division in which it could have been brought." Second, the Court could exercise its discretion under the "pendant venue" doctrine.[94]

Yet Mayo has not asked the Court to exercise pendant venue, and the Court believes the "interest of judgment" does not support dismissal. The Court, therefore, will transfer Mayo's RFRA claim to the district "in which it could have been brought"—the District of North Dakota.

## CONCLUSION

The subject matter of the agency action becomes almost secondary. Be it HHS, the SEC, or some other agency, what is most troubling is the trending technique federal agencies are using as standard strategy in implementing the executive branch's policy goals in contravention of the rule of law. This technique, as explained above, is laundering, or

---

[92] *Jones v. Bales*, 480 F.2d 805 (5th Cir. 1973) (per curiam) (unpublished).
[93] 920 F. Supp. 2d 724, 747 (N.D. Tex. 2013).
[94] *See Seamon v. Upham*, 563 F. Supp. 396, 389–99 (E.D. Tex. 1983).

smurfing, an executive policy goal into "unreviewable" and "unchallengeable" pieces while reinforcing the whole with an implicit enforcement threat. What's more, this compartmentalization of executive policy in an effort to avoid legal consequence is done in the open for all to see, though no one is supposed to notice.

Those days are gone; the Court notices. This administration has, before and since *Dobbs*, openly stated its intention to operate by fiat to find non-legislative workarounds to Supreme Court dictates. This Court will not play along with such a breach of constitutional constraints.

It is therefore **ORDERED** that Defendants' Motion to Dismiss under Rule 12(b)(1) be **DENIED**.

It is also **ORDERED** that Defendants' Motion to Dismiss under Rule 12(b)(3) be **GRANTED IN PART** and that Mayo's RFRA claim be **TRANSFERRED** to the District of North Dakota.

It is also **ORDERED** that Defendants' Motion to Dismiss under Rule 12(b)(6) be **DENIED** as **MOOT**.

It is so **ORDERED**.

SIGNED this 12th day of July, 2023.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE