IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| **THE STATE OF TEXAS, MAYO PHARMACY, INC.,** | § | |
| *Plaintiffs*, | § | **MO:23-CV-00022-DC** |
| | § | |
| **v.** | § | |
| | § | |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN SERVICES; AND UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE FOR CIVIL RIGHTS,** | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION

Imagine two plots of land divided by an unfenced property line. One day, the owner of Plot A decides to fence off that property line, publishing his plans to do so in the local newspaper. Plot B's owner sees the plans in the paper and discovers that the fence will be located five feet onto his property, thus effectively reducing Plot B's size. So rightfully seeking to avoid that injury, Plot B's owner sues to stop the fence's construction.

Despite being sued, Plot A's owner tells the judge that Plot B's owner would not be injured because the proposed fence runs along what Plot A's owner believes is the legally correct property line. But the judge disagrees, ruling that the legal property line between the two plots is clearly delineated in the county records, and thus there is an imminent risk that Plot B's owner would be injured. So appearing to take the judge's ruling to heart, Plot A's owner publicly republishes a revised plan with the fence located on the correct property line,

stating that he seeks to give the owner of Plot B everything he wanted because it was never his intent for the fence to encroach on Plot B.

Yet Plot A owner's clear attempts to resolve the dispute by genuflecting to the judge's ruling are not enough for Plot B's owner. Indeed, Plot B's owner believes the risk of injury is still imminent because the owner of Plot A could hypothetically build the fence in the original, encroaching location. So is the argument that Plot B's owner could still "hypothetically" be injured—despite the owner of Plot A's public remorse and statements to the contrary—enough to keep the case going as a live dispute?

If the above scenario were before this Court, the answer would be no.

## BACKGROUND

Section 1557 of the Affordable Care Act ("Section 1557") and its implementing regulations[1] prohibit discrimination in any health program or activity that receives Federal financial assistance on grounds prohibited under the following civil rights laws:

(1) Title VI of the Civil Rights Act of 1964 (race, color, national origin),[2]

(2) Title IX of the Education Amendments of 1972 (sex, pregnancy, sexual orientation, and gender identity),[3]

(3) the Age Discrimination Act of 1975 (age),[4] or

(4) Section 504 of the Rehabilitation Act of 1973 (disability).[5]

The Department of Health and Human Services' ("HHS") Office for Civil Rights ("OCR") enforces Section 1557's non-discrimination proscriptions mainly through a

---

[1] 42 U.S.C. § 18116; 45 C.F.R. § 92.2
[2] 42 U.S.C. § 2000d et seq.
[3] 20 U.S.C. § 1681 et seq.
[4] 42 U.S.C. § 6101 et seq.
[5] 29 U.S.C. § 794.

complaint-driven process.[6] For example, if a pharmacy's customer believes that the pharmacy's actions violate civil rights law, that customer may file a complaint with the OCR.[7] If that complaint is timely, the OCR would open an investigation, which would include a review of the pharmacy's "pertinent practices and policies" and the "circumstances under which the possible noncompliance occurred."[8] And based on that "investigation," the OCR will conclude that no violation has occurred or, if one has occurred, resolve the matter "by informal means whenever possible."[9]

On July 13, 2022, HHS issued a guidance document ("Pharmacy Guidance") to remind United States retail pharmacies of their obligations under Section 1557.[10] In short, the Pharmacy Guidance reiterates that under Section 1557, pharmacies that receive federal financial assistance may not discriminate against pharmacy customers based on race, color, national origin, sex, age, or disability.[11] And the OCR would provide "vigorous enforcement" against such discrimination.[12]

Approximately six months after the Pharmacy Guidance was issued, the state of Texas and Mayo Pharmacy, Inc. ("Plaintiffs") sued HHS, the OCR, and HHS Secretary Becerra in his official capacity (together, "Defendants"), alleging the Pharmacy Guidance required pharmacies to dispense abortion-inducing drugs as a condition of receiving federal

---

[6] 45 C.F.R. § 92.5.
[7] *Id.* § 80.7(b).
[8] *Id.* § 80.7(c).
[9] *Id.* § 80.7(d)(1)–(2).
[10] Guidance to Nation's Retail Pharmacies: Obligations Under Fed. Civil Rights Laws to Ensure Access to Comprehensive Reproductive Health Care Services (July 13, 2022) (found at Doc. 1, Ex. 3) [hereinafter Pharmacy Guidance].
[11] *Id.*
[12] *Id.* at 2.

financial assistance like Medicare and Medicaid funds.[13] Specifically, Texas claimed the Pharmacy Guidance sought to preempt its state laws prohibiting abortion, while Mayo claimed a requirement to dispense drugs for abortion purposes violated its sincerely held religious beliefs. Defendants then moved to dismiss Plaintiffs' claims, arguing that the Pharmacy Guidance required no such thing.[14]

This Court did not buy Defendants' argument. In denying Defendants' motion, the Court noted the Pharmacy Guidance's "temporal and thematic relationship" with the current administration's vociferous contempt of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*.[15] For instance, a mere two weeks after *Dobbs*, the Biden Administration issued an Executive Order, titled "Protecting Access to Reproductive Healthcare Services."[16] This Executive Order instructed HHS to "identify potential actions (A) to protect and expand access to abortion care, *including medication abortion*; and (B) to otherwise protect and expand access to the full range of *reproductive healthcare services*[.]"[17]And then three days later, HHS released the Pharmacy Guidance. So based on the suspicion that Defendants were "smurfing" the administration's policy goal contrary to the Supreme Court's holding in *Dobbs*, the Court shot down Defendants' motion.

Almost three months after the Court denied Defendants' motion to dismiss, HHS revised the Pharmacy Guidance ("Revised Guidance") "to clarify that the guidance does not

---

[13] Doc. 1.
[14] Doc. 31 at 8.
[15] 142 S. Ct. 2228, 2279, 2284 (2022) (holding that "the Constitution does not confer a right to abortion" and "does not prohibit the citizens of each State from regulating or prohibiting abortion.").
[16] Protecting Access to Reproductive Healthcare Services,  Exec. Order No. 14,076, 87 Fed. Reg. 42053, 42053 (July 8, 2022)
[17] *Id.* (emphasis added).

require pharmacies to fill prescriptions for medication for the purpose of abortion."[18] Defendants then moved for summary judgment, contending primarily that the Revised Guidance renders this case moot.[19] Plaintiffs also moved for summary judgment, arguing that the case is not moot, and thus the merits should be reached, because the Revised Guidance still requires them to dispense drugs for abortion purposes.[20] The Court held an in-person oral argument on the Parties' cross-motions on January 26, 2024, and the issues are ready to be resolved.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.[21] Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "When assessing a summary judgment motion in an APA case, the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."[22] "In the context of a challenge to an agency action under the APA, '[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and

---

[18] Guidance to Nation's Retail Pharmacies: Obligations Under Fed. Civil Rights Laws to Ensure Nondiscriminatory Access to Health Care at Pharmacies. (Sept. 29, 2023) (found at Doc. 52, Ex. 1) [hereinafter Revised Guidance].
[19] Doc. 52.
[20] Doc. 49. The Court notes that Plaintiffs' summary judgment motion was filed before the Revised Guidance was issued. But Plaintiffs filed supplemental briefing (Doc. 53) and had opportunities to address the arguments raised by the Revised Guidance their response to Defendants' motion and oral argument before the Court.
[21] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).
[22] *Permian Basin Petrol. Ass'n v. U.S. Dep't of the Interior*, 127 F. Supp. 3d 700, 706 (W.D. Tex. 2015).

consistent with the APA standard of review.'"[23] Indeed, "[i]t is well established that when a district court reviews a summary judgment motion concerning an agency's action, the court determines not whether the material facts are disputed, but whether the agency properly dealt with the facts."[24]

## DISCUSSION

Before the Court can reach the merits of Plaintiffs' claims, the threshold question of mootness must be answered. Article III of the Constitution extends federal courts' "judicial power" "only to 'Cases' and 'Controversies.'"[25] "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'"[26] And if a case becomes moot, it must be dismissed for lack of subject matter jurisdiction.[27] That is Defendants' main argument.

## I.    Is this case moot?

"Mootness most commonly comes in two circumstances: (1) when the plaintiff stops seeking relief or obtains relief by settling, and (2) when events occurring after the filing of suit make the relief sought no longer possible or useful."[28] This case falls under the second circumstance.

---

[23] *Delta Talent, LLC v. Wolf*, 448 F. Supp. 3d 644, 650 (W.D. Tex. 2020) (quoting *Am. Stewards of Liberty v. Dep't of Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019)).
[24] *Garcia for Congress v. FEC*, 22 F. Supp. 3d 655, 659 (N.D. Tex. 2014) (cleaned up).
[25] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), *as revised* (May 24, 2016) (citing U.S. Const. Art. III, § 2).
[26] *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)).
[27] *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).
[28] Bryan A. Garner, et al., The Law of Judicial Precedent 44 (2016) (citing 13B Charles Alan Wright, Arthur R. Miller et al., Federal Practice and Procedure § 3533, at 716, 718 (2008)).

When analyzing mootness in the agency action context, the Fifth Circuit's general rule is "when a challenged rule is replaced with a new rule, the case is moot so long as the change gives 'the precise relief that petitioners requested.'"[29] Defendants believe they've taken steps, such as issuing the Revised Guidance, that make clear Plaintiffs are not required to dispense drugs for abortion purposes. Plaintiffs, of course, disagree with Defendants, claiming that the Revised Guidance still does not provide them with the "precise relief" they request. So, logically, the first question is what's the "precise relief" that Plaintiffs request?

### A. What is the "precise relief" that Plaintiffs request?

The "precise relief" requested by Plaintiffs is simple to define. Plaintiffs allege that the original Pharmacy Guidance forces Plaintiffs "to stock and dispense drugs for abortion purposes."[30] Plaintiffs' Amended Complaint does state, however, that Mayo has no issue with stocking drugs like methotrexate and misoprostol for non-abortion purposes.[31] And Texas law does not prohibit pharmacies from stocking those drugs. So stocking the drugs is not the problem; the "precise relief" Plaintiffs request is that they *not* be forced to dispense those stocked drugs for abortion purposes.

In short, this case hinges on the answer to one question: does the Revised Guidance require Plaintiffs to dispense drugs for abortion purposes?

### B. Does the Revised Guidance require Plaintiffs to dispense drugs for abortion purposes?

Defendants asserted in their motion to dismiss that the original Pharmacy Guidance did not require pharmacies like Mayo or those in Texas to dispense drugs for abortion

---

[29] *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022).
[30] Doc. 14 at 9, 12. Being forced to dispense medications for abortion purposes would violate Texas's sovereign interest in enforcing its laws and Mayo's sincerely held religious beliefs.
[31] *Id.* at 12.

purposes.[32] But due to the flurry of abortion-related executive orders, press releases, and guidance documents released by this administration mere weeks after the Supreme Court's decision in *Dobbs*, this Court doubted that claim. Thus, the Court denied Defendants' motion, detailing its suspicion that Defendants were "smurfing" the administration's abortion priorities through the Pharmacy Guidance.[33]

The Court's strong denial had an impact. Only a short time after their motion was denied, Defendants revised the Pharmacy Guidance "[b]ecause defendants did not want to leave in place a guidance document that a federal court had construed as imposing a requirement that they did not intend to impose."[34] To that end, Defendants issued the Revised Guidance, adding a disclaimer that "the guidance does not require pharmacies to fill prescriptions for medication for the purpose of abortion; nor does the guidance suggest or imply an obligation of pharmacies to fill prescriptions for medication in violation of State laws, including those banning or restricting abortion."[35]

Defendants even changed the document's title. Indeed, the Pharmacy Guidance was originally titled "Obligations under Federal Civil Rights Laws to Ensure Access to Comprehensive Reproductive Health Care Services"[36] As the Court noted at the motion to dismiss stage, that title made it hard to believe the Pharmacy Guidance was "somehow *not* about abortion."[37] But now, the Revised Guidance is titled "Obligations under Federal Civil

---

[32] Doc. 31 at 8.

[33] *See generally Texas v. United States Dep't of Health & Hum. Servs.*, No. MO:23-CV-00022-DC, 2023 WL 4629168, (W.D. Tex. July 12, 2023)

[34] Doc. 55 at 1.

[35] Revised Guidance at 2.

[36] Pharmacy Guidance at 1.

[37] *Texas v. United States Dep't of Health & Hum. Servs.*, No. MO:23-CV-00022-DC, 2023 WL 4629168, *6 (W.D. Tex. July 12, 2023) (emphasis in original).

Rights Laws to Ensure *Nondiscriminatory Access to Health Care at Pharmacies*."[38] Backing completely away for "reproductive health care" is a change worth noting.

Yet despite the textual changes, which appear crafted specifically to capitulate to Plaintiffs' claims, Plaintiffs remain unpersuaded. Texas argues that the Revised Pharmacy Guidance still "forces Texas pharmacies to choose between compliance with state law and potential enforcement actions by HHS."[39] Likewise, Mayo believes that "even the Revised Guidance on its own terms continues to impose the requirement that Mayo dispense methotrexate to end a growing unborn life."[40]

> i. *Does the Revised Pharmacy Guidance require Texas pharmacies to fill prescriptions in violation of Texas law?*

If a Texas pharmacy is truly forced to choose between following Texas law or the Pharmacy Guidance, then there must be some conflict between the two.

Texas has two main laws that ban or restrict abortion. The first is Texas' Human Life Protection Act, which states that "[a] person may not knowingly perform, induce, or attempt an abortion."[41] The second, contained in another series of statutes, makes it a crime for any person to cause or furnish the means for procuring an abortion knowing the intended purpose.[42] In sum, a pharmacy faces criminal prosecution under Texas law if it fills a prescription knowing that the prescribed medication will be used for abortion purposes.[43]

---

[38] Revised Guidance at 1.
[39] Doc. 57 at 17–18.
[40] *Id.* at 19.
[41] Act of May 25, 2021, 87th Leg., R.S., ch. 800, 2021 Tex. Sess. Law Serv. 1887 (H.B. 1280) (codified at Tex. Health & Safety Code Ch. 170A).
[42] Tex. Rev. Civ. Stat. arts. 4512.1, 4512.2.
[43] *Id.* art. 4512.1 ("If any person shall … knowingly procure to be administered with her consent any drug or medicine, … and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled.").

The problem for Texas, however, is that the Revised Guidance plainly states that it does not "suggest or imply an obligation of pharmacies to fill prescriptions for medication in violation of State laws, including those banning or restricting abortion."[44] With such a clear disclaimer, the Court does not see how Texas law and the Pharmacy Guidance's text conflict, much less conflict so much that Texas pharmacies face an impossible compliance choice.

### ii.   Does the Pharmacy Guidance require Mayo to fill prescriptions for abortion purposes?

Likewise, Mayo's assertion that the Revised Guidance "on its own terms" still requires it to dispense certain drugs like methotrexate runs into the same problem. The Revised Guidance's plain text states that "the guidance does not require pharmacies to fill prescriptions for medication for the purpose of abortion."[45] That's not to say language found in the other agency guidance documents previously highlighted by this Court don't contain such requirements.[46] In fact, Defendants readily concede that this administration "is trying to do things within its legal authority to promote access to abortion care."[47] But Defendants' point is that it doesn't mean *this* guidance document is trying to do so. Based on the vast scope of the executive branch's bureaucracy, that point is well taken.

At the same time, this Court is not convinced that the Revised Guidance's added disclaimer alone assuages Plaintiffs' fears in any real way. Indeed, as Plaintiffs point out, the Revised Guidance also contains seven examples in which a pharmacy's refusal to dispense

---

[44] Revised Pharmacy Guidance at 2.
[45] Revised Guidance at 2.
[46] *See Texas v. United States Dep't of Health & Hum. Servs.*, No. MO:23-CV-00022-DC, 2023 WL 4629168, *9 (W.D. Tex. July 12, 2023) (noting that two days before the Pharmacy Guidance was released, HHS issued clarifying guidance on the Emergency Medical Treatment and Active Labor Act ("EMTALA")).
[47] Doc. 66 at 73 [hereinafter Oral Argument Transcript].

medication prescribed *for non-abortion purposes* "may violate civil rights laws."[48] So simply claiming that the Revised Guidance "does not require pharmacies to fill prescriptions for medication for the purpose of abortion" may not be sufficient.

### C. What happens when abortion drugs are prescribed for non-abortion purposes?

One such example[49] from the Revised Guidance is where "[a]n individual with rheumatoid arthritis, such that their condition meets the definition of a disability under civil rights laws, is prescribed methotrexate."[50] And if "the pharmacy refuses to fill the individual's prescription or does not stock methotrexate because of its alternate uses, it may be discriminating on the basis of disability."[51] Plaintiffs believe this "example" (and the others) are merely an attempt to backdoor an obligation to dispense abortion drugs. Plainly put, Plaintiffs' concern is that anyone—pregnant or not—can walk into a pharmacy with a prescription for methotrexate, which the pharmacy must fill under every circumstance because the prescription was lawfully prescribed for a non-abortion purpose like rheumatoid arthritis. It's not an unreasonable concern.

That said, the Court notes that these concerns only become a reality when three things are present. First, the patient for whom the prescription is written must be a woman; why it must be a woman (and not a man) should be obvious.[52] Second, the woman's prescription must have been "lawfully prescribed." This means, as Defendants recognize, that any medication prescribed by a doctor in Texas *for abortion* would not be "lawfully

---

[48] Doc. 57 at 11 (citing Revised Guidance at 3–4).
[49] Other applicable examples from the Revised Guidance include someone with chronic stomach ulcers and various miscarriage scenarios. The Court chose the rheumatoid arthritis example because it is the clearest and easiest applied, non-abortion example.
[50] Revised Guidance at 4.
[51] *Id.*

prescribed" because it violates state law.[53] Thus, the prescription would need to be for a legitimate, non-abortion purpose like rheumatoid arthritis.

Lastly, the pharmacy must "know" that the woman is pregnant. For example, a pharmacy violates Texas law when it furnishes the means for procuring an abortion "knowing" the intended purpose.[54] Likewise, Mayo states its sincerely held religious beliefs prevent it from "intentionally or knowingly providing drugs such as methotrexate or misoprostol for abortion purposes."[55] That, of course, raises a question: how would a pharmacy "know" the woman is pregnant?

The Court thinks the only ways a pharmacy would "know" if a woman is pregnant (in polite society) would be if either (a) it is told the woman is pregnant, or (b) the pregnancy is visibly obvious to the normal bystander.[56] Plaintiffs, however, might say those aren't the only options. Indeed, the unspoken scenario here seems to be a woman, early in her pregnancy, in collusion with a "pro-abortion doctor," surreptitiously using a fictitious "rheumatoid arthritis prescription" to gain access to a drug like methotrexate. Even assuming that is a widespread practice—and there's no evidence that it is—surely Plaintiffs' position is not that pharmacies become on-the-spot doctors, eyeballing whether a woman is 10- or 30-weeks pregnant (or even pregnant at all) so they don't "knowingly" violate state law or their religious beliefs. No, the pharmacy must "know" it to be the case.

---

[52] The Court defines a woman as "an adult human female."
[53] Oral Argument Transcript at 76–77.
[54] *See, e.g.*, Tex. Rev. Civ. Stat. art. 4512.1.
[55] Doc. 14 at 13.
[56] The Court does not condone participating in the risky endeavor of asking about the pregnancy status of a non-family member in public.

Yet no matter how rare that situation might be, the Court believes determining what obligations the Revised Guidance imposes in such a situation is important because the pharmacy's ability to exercise its discretion would be paramount. Thus, the Court created the following hypothetical premise:

> a visibly pregnant woman comes into a pharmacy with a methotrexate prescription for her rheumatoid arthritis.

In this scenario, Plaintiffs have consistently answered that they would not dispense the methotrexate because doing so would "knowingly" be providing the means to end a human life. So the million-dollar question is, assuming a complaint was filed, would the OCR's enforcement hammer come crashing down on Plaintiffs?

Much to the Court's surprise, Defendants' answer at the summary judgment hearing was a resounding no. In fact, Defendants stated that even "[i]f OCR received a complaint, OCR would determine on the basis of the complaint that it is invalid."[57] And when the Court pressed the hypothetical again, Defendants affirmed once more "[i]f HHS received a complaint based on that, HHS would quickly reject that complaint because in HHS's view, that is not a violation of law. And that's certainly not something that HHS would go out of its way to investigate."[58]

The Court then changed the question slightly, asking Defendants if OCR would investigate if the pharmacy's reason for not dispensing the drugs was *because* the woman was pregnant—which seemingly would violate Title IX's prohibition on pregnancy discrimination. Defendants responded with the same answer: "if that complaint came before

---

[57] Oral Argument Transcript at 67.
[58] *Id.* at 70.

HHS, HHS would quickly reject it because its position is that that's not a violation of the law."[59] Those answers do not sound like Defendants are seeking to interfere with the discretion of pharmacies.

Plaintiffs also argue that "HHS has not given any assurance that it will never conduct investigations of Texas pharmacies or Mayo for failing to fill prescriptions for abortion-inducing drugs, or for 'lawfully prescribed medication.'"[60] But as highlighted above, it appears Defendants have repeatedly done so, before the Court and in writing.

What's more, asking for assurances that HHS "will never conduct investigations" doesn't even make sense considering how OCR's complaint-driven system works. The Parties agree that OCR can generally investigate discrimination complaints. For example, if a pharmacy refused to fill a lawfully prescribed methotrexate prescription because the patient was black, everyone agrees this would fall well-within OCR's investigatory duties.[61] Yet under the applicable regulations, HHS does not fully know "the circumstances under which the possible noncompliance occurred"—whether the pharmacy's refusal was based on racial animus, sincerely held religious beliefs, or Texas' abortion laws—*until after it opens an investigation*.[62] It would be practically impossible for Defendants to provide the requested "assurances" without cratering the statutory and regulatory powers OCR uses to prevent discrimination in healthcare. So asking for those "assurances" can't be right.

In sum, it's hard for this Court to conclude that, based on the Revised Pharmacy Guidance's textual changes and Defendants' in-person concessions, Plaintiffs are under

---

[59] *Id.* at 71.
[60] Doc. 57 at 15.
[61] *See, e.g.*, Oral Argument Transcript at 83.
[62] *See* 45 C.F.R. § 80.7(c).

some legal obligation here to dispense drugs for abortion purposes. What's more, even when the prescription is "for non-abortion purposes," if filling that prescription would violate Texas law or Mayo's sincerely held religious beliefs, Defendants' stated position is that any complaint under those circumstances would be "quickly rejected." So the Court is unsure what part of "precise relief" remains unaddressed; Plaintiffs appear to have received everything they request.

And it seems as if that was Defendants' intent. For instance, when the Court asked why the Parties couldn't agree to a "Joint Declaratory Judgment" of sorts for the Court to enter, thus giving Plaintiffs a "parchment guarantee," Defendants responded that such would constitute an advisory opinion because "when the Government gives the other side what it wants, the Court says yes, the case is moot."[63]

## II.     The strange realities of this case.

From the Court's perspective, it's hard to account for the Revised Guidance's plain text, Defendants' reasons for issuing the Revised Guidance, and Defendants' in-person statements, but then still conclude that Plaintiffs will be forced to dispense drugs for abortion purposes. Indeed, it seems the only way the Court could even "reasonably expect" that Plaintiffs' alleged injury would occur at this point would be for the Court to disregard all of Defendants' actions as deceptive litigation posturing.

To be sure, that argument appeals to the Court's healthy distrust for the fourth branch of government. But there is no evidence that Defendants have tried to enforce these "obligations" against Mayo or any pharmacy in Texas in the almost two years since the

---

[63] Oral Argument Transcript at 74.

Pharmacy Guidance was issued. And this is the pre-enforcement context, where Plaintiffs' alleged injury must be "imminent, not conjectural or hypothetical."[64] Plaintiffs also "can no longer rest on mere allegations" like they could at the motion to dismiss stage.[65] They "must set forth specific facts."[66] But "specific facts" revealing a "substantial" likelihood of future enforcement *against these Plaintiffs* are glaringly absent.[67]

The many strange realities of this case are not lost on the Court. For one thing, it's odd for the Court to believe its decision—no matter which party the Court sides with—makes no practical impact whatsoever. For example, a win for Plaintiffs would mean that the Revised Guidance does not require Plaintiffs to dispense drugs for abortion purposes. In contrast (or not), a win for Defendants would also mean that the Revised Guidance does not require Plaintiffs to dispense drugs for abortion purposes. So no matter who "wins," it's six of one, half a dozen of the other.

And if the outcome is the same, how is there a "legally cognizable interest" in the outcome?[68] There's not. Which only reinforces the Court's conclusion that this case is now moot.

Admittedly, that conclusion is frustrating. On one hand, it took this Court's strongly worded opinion at the motion to dismiss stage before Defendants took Plaintiffs' concerns

---

[64] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).
[65] *California v. Texas*, 593 U.S. 659, 675 (2021) (cleaned up).
[66] *Id.* (cleaned up).
[67] *Id.* ("In the absence of contemporary enforcement, we have said that a plaintiff claiming standing must show that the likelihood of future enforcement is 'substantial.'") (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164, (2014)).
[68] *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). (internal quotations removed).

seriously.[69] On the other hand, Plaintiffs fail to take Defendants' subsequent actions for what they are—an agency reissuing a specific guidance document because a federal court's interpretation (that the original agency guidance required pharmacies to dispense drugs for abortion purposes) was apparently not what that agency intended; thereby rendering this case moot.

## CONCLUSION

Defendants have given Plaintiffs the relief requested and then some. The Court's holding, therefore, is simple:

- The Revised Guidance does not require Plaintiffs to dispense drugs for abortion purposes.

- The Revised Guidance does not require Plaintiffs to dispense drugs for non-abortion purposes when doing so would violate Texas's abortion laws or Mayo's sincerely held religious beliefs.

- Based on Defendants' repeated affirmations in-person before the Court and in writing, any investigation by OCR based on a complaint arising from either of the above scenarios involving Plaintiffs should be quickly resolved without need for judicial intervention.[70]

Defendants are right; when one side gives the other everything it asks for, that renders the case moot. Plaintiffs have received everything they asked for; they should take the win. As a result, the issues are now moot and the Court lacks jurisdiction.

---

[69] The Court does note that since that point, Defendants have been markedly more straightforward with the Court on these issues.

[70] If Mayo or Texas pharmacies start suffering prolonged investigations inconsistent with the Revised Guidance's plain language and Defendants' statements to the Court, the Court believes a temporary restraining order or preliminary injunction filed in this Court by plaintiffs mired in such circumstances would likely be viewed favorably posthaste.

It is therefore **ORDERED** that Defendants' Motion for Summary Judgment be **GRANTED** (Doc. 55) and Plaintiffs' Motion for Summary Judgment be **DENIED** (Doc. 49).

It is so **ORDERED**.

SIGNED this 5th day of April, 2024.

DAVID  COUNTS
UNITED STATES DISTRICT JUDGE